**In re The OYSTER CLUB OF GREEN-WICH LIMITED PARTNERSHIP, Debtor.**

**The OYSTER CLUB OF GREENWICH LIMITED PARTNERSHIP, Plaintiff,**

**v.**

**MIANUS RIVER ASSOCIATES, Defendant.**

**Bankruptcy No. 5–88–01129.
Adv. No. 5–89–0045.**

United States Bankruptcy Court, D. Connecticut.

April 18, 1989.

William R. Kohler, Bleakley, Platt & Schmidt, Greenwich, Conn., for plaintiff.

Paul L. McCullough, Stamford, Conn., for defendant.

MEMORANDUM AND DECISION ON COMPLAINT SEEKING DECLARA-TORY JUDGMENT ON VITALITY OF COMMERCIAL LEASE

ALAN H.W. SHIFF, Bankruptcy Judge.

The plaintiff seeks a declaratory judgment that its unexpired commercial lease with the defendant was still in effect at the time it filed its bankruptcy petition.

## I.

The property at issue is a restaurant located in a river front residential—commercial complex in Greenwich, Connecticut, owned and developed by the defendant. It contains, in addition to the restaurant, residential condominiums in the $250,000.00 to $475,000.00 range, a marina, and an office building. On February 23, 1979, Combine of Fairfield, Inc., leased the restaurant from the defendant for a term of fifteen years. Pursuant to Article Seventh, ¶ 7.02, Combine assigned the lease in April of 1987 to Wolfeboro Restaurant Services, Inc., a New Hampshire corporation, with the consent of the defendant.[1] On February 18, 1988, Wolfeboro assigned the lease, with the consent of the defendant, to the plaintiff, a Connecticut limited partnership. Wolfeboro is the plaintiff's general partner.

In the early summer of 1988, Rex Seley, Wolfeboro's chief executive officer and a limited partner of the plaintiff, met with the plaintiff's other limited partners to discuss the restaurant's losses, and they decided to stop paying rent so that suppliers and employees could be paid while they looked for a buyer. *Plaintiff's Pre–Trial Brief at 6.* On June 22, 1988, the defendant sent a request for the payment of $22,500.00 past due rent for April, May and June, and $9,432.26 in real estate taxes. *Defendant's Exhibit A.* On August 22nd the defendant sent another letter notifying the plaintiff that it was approximately three weeks late in submitting a statement of gross sales to be used in calculating percentage rent as required by Article First, ¶ 1.6(a), of the lease. *Defendant's Exhibit B.* On September 13th the defendant sent a third letter, complaining about the plaintiff's failure to pay base rent and real estate taxes, submit a statement of gross sales, and provide a certificate of insurance. *Defendant's Exhibit D.* At that time the arrearage had reached $41,000.00.

On September 29, 1988, the defendant sent by certified mail a formal notice of default, *Defendant's Exhibit F,* which was received by the plaintiff on October 4, 1988. *Defendant's Exhibit G.* The demand stated in part:

> If Tenant does not cure the ... defaults within ten (10) days from the date hereof, Landlord and/or its agent, Yankee Property of Connecticut, Inc., which has the authority to act on Landlord's behalf, shall vigorously enforce the rights of Landlord by commencing legal proceedings to collect all sums of money owed by Tenant and/or Guarantors and to evict Tenant from the premises.

The plaintiff's management claims that it received none of these letters. It is noted, however, that the return receipt for the notice of default was signed by Chris Saputo, who was employed by Bleakley, Platt & Schmidt, plaintiff's counsel. *Defendant's Exhibit G.* The Bleakley firm's address was given to the defendant as the place to send notices under the lease. *Plaintiff's Exhibit 5.*

In early October, 1988, Seley and Richard J. Reeves, the president of Wolfeboro, advised the defendant's managing agent, Mario J. Tarantino, by phone and by letter, *Plaintiff's Exhibit 6,* that due to the failing economic condition of the plaintiff's restaurant, an effort was being made to sell the restaurant and assign the lease. Tarantino's response was "positive", but the defendant was not requested to and it did not agree to suspend future rent payments or wait for the payment of rent then due.

On October 5, 1988, the plaintiff entered into a brokerage agreement with Victor Kleine which gave him the exclusive right to sell the restaurant. In early November, Kleine communicated the offer of a proposed purchaser-assignee, Hogan's Casa Miguel, Inc., a "Mexican style restaurant", to Reeves. On November 8, 1988, the defendant received a letter from the plaintiff

---

1. Paragraph 7.02 provides in part:
   "[T]he Tenant covenants and agrees, for the Tenant and its successors, assigns and legal representatives, that neither this lease nor the term and estate hereby granted, nor any part hereof or thereof, ... will be assigned ... without the prior consent of the Landlord ..." *Plaintiff's Exhibit 1.*

seeking consent to the assignment of the lease to Hogan's. *Plaintiff's Exhibit 9.* By a letter dated November 14th, the defendant informed the plaintiff of its refusal, stating that Hogan's Mexican style restaurant would not be the best use of the waterfront property, and that it preferred a seafood restaurant. *Defendant's Exhibit 1.* Kleine received other inquiries, but no written offers or proposals. On December 7th the plaintiff closed the restaurant.

Sheriff Richard Moccia claims that on December 8th, at the direction of the defendant, pursuant to lease Article Twenty-First, ¶ (e), *see infra,* he served a notice to quit by pushing it through the outside double glass doors of the closed restaurant. *Deposition Transcript, March 7, 1989, at 6, 10.* On December 15th the plaintiff filed a petition under chapter 11. The defendant claims that it never received the notice to quit and only learned of its existence on January 26, 1989, at the first meeting of creditors called pursuant to Code § 341(a).

Just after the first week of December, 1988, Tarantino visited the premises, noted that the doors were locked, and observed a sign through the double glass front doors stating that the restaurant was closed for renovations and would be open on January 16th. Tarantino also observed an accumulation of mail and papers on the vestibule floor.

The restaurant had been leased on a so-called triple net basis. Kleine and the plaintiff had the only keys. In order to show the premises to a prospective new tenant sometime after Christmas, Tarantino requested a key from Kleine, who refused without the plaintiff's permission. When permission was withheld, Tarantino changed the locks and gave a new key to Kleine. Tarantino returned to the restaurant in January, 1989, and observed that the mail and papers in the vestibule were gone.

## II.

■ Under the relevant provisions of § 365, a debtor in possession, subject to court approval, may assume an unexpired lease unless "such lease is of nonresiden-

tial real property and has been terminated under applicable nonbankruptcy law prior to the order for relief." 11 U.S.C. § 365(a), (c)(3). A two part analysis is applied to determine whether the plaintiff may assume the restaurant lease. It first must be ascertained whether the lease was terminated under applicable state law before the petition was filed. If it was, it then must be determined whether that result would be reversed under the state's nonforfeiture doctrine. *Vanderpark Properties, Inc. v. Buchbinder (In re Windmill Farms, Inc.),* 841 F.2d 1467, 1472 (9th Cir.1988); *Rich-Taubman Assoc. v. Masterworks, Inc. (In re Masterworks, Inc.),* 94 B.R. 262, 265 (Bankr.D.Conn.1988), *appeal docketed,* Civ. No. B–89–167 (WWE) (D.Conn. March 28, 1989).

### A.

#### Notice to Quit

Connecticut General Statutes § 47a–23 provides in part:

(a) When a ... lease of any land or building ... terminates ... by reason of any expressed stipulation therein ... and the owner or lessor ... desires to obtain possession or occupancy of the same, at the termination of the rental agreement or lease, ... he or they shall give notice to the lessee or occupant to quit possession of such land [or] ... building ... at least eight days before the termination of the rental agreement or lease ... or before the time specified in the notice for the lessee or occupant to quit possession or occupancy.

. . . .

(c) A copy of such notice shall be delivered to each lessee or occupant or left at his place of residence or, if the rental agreement or lease concerns commercial property, at the place of the commercial establishment by a proper officer or indifferent person.

Conn.Gen.Stat.Ann. § 47a–23(a), (c) (West Supp.1988).

Article Twenty-First, ¶ (e), of the lease provides:

[I]n case the Tenant shall default in the payment of any fixed rent, additional rent or percentage rent (if any) on any date upon which the same becomes due, or shall default in furnishing to the Landlord any statement required to be furnished by the tenant to the Landlord for use as a basis in computing any percentage rent payable hereunder, and any such default shall continue for 10 days after the Landlord shall have given to the Tenant a notice specifying such default, ...

....

... the Landlord may give to the Tenant a notice of intention to end the term of this lease at the expiration of 3 days from the date of the giving of such notice, and, in the event such notice is given, this lease and the term and estate hereby granted ... shall terminate upon the expiration of said 3 days with the same effect as if the last of said 3 days were the date hereinbefore set for the expiration of the full term of this lease....

*Plaintiff's Exhibit 1.*

The service of a notice to quit terminates a lease under Connecticut law. *In re Masterworks, supra*, 94 B.R. at 267; *Mayron's Bake Shops, Inc. v. Arrow Stores, Inc.*, 149 Conn. 149, 156, 176 A.2d 574 (1961); *The Chapel-High Corp. v. Cavallaro*, 141 Conn. 407, 411, 106 A.2d 720 (1954); *City of Bridgeport v. Barbour-Daniel Elec., Inc.*, 16 Conn.App. 574, 548 A.2d 744 (1988).

1.

■ The plaintiff contends, without persuasive argument or decisional authority, that the service of the notice to quit did not satisfy the due process requirements of the United States Constitution and was therefore ineffective. *Plaintiff's Pre-Trial Brief at 9-10.* In *Kron v. Thelen*, 178 Conn. 189, 423 A.2d 857 (1979), which is

relied upon by the plaintiff, the Connecticut Supreme Court held that Connecticut General Statutes § 45-289, which imposes a thirty day time limit for filing appeals of Probate Court decisions, is subject to the implied requirement that the Probate Court give notice of its decision. That case is clearly inapposite.

By the plaintiff's logic, it may avoid the consequences of a notice to quit by merely closing its business. That logic is flawed. If the plaintiff abandoned the premises, there would be no lease to assume. If it didn't, it cannot immunize itself from the service of a notice to quit by hiding behind locked doors. I find that § 47-23(c) is "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections ...," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) and therefore satisfies due process. The notice to quit was properly served and terminated the lease.

2.

■ The plaintiff contends that changing the locks and giving Kleine a new key nullified the notice to quit. That conclusion could only be reached if the giving of a key was inconsistent with the defendant's intent to compel the plaintiff to vacate the premises. *See Sandrew v. Pequot Drug, Inc.*, 4 Conn.App. 627, 495 A.2d 1127 (1985); *Danpar Assoc. v. Falkha*, 37 Conn.Supp. 820, 438 A.2d 1209 (Super.Ct.1981). No such conclusion is justified here.

Giving a new key to the plaintiff was not an isolated event. As noted the plaintiff had the only key. The defendant had a right and a need to enter the premises both to inspect them when it became apparent that the plaintiff was absent and to show them to a prospective tenant. Conn.Gen. Stat.Ann. § 47a-16 (West Supp.1988).[2] In-

---

2. Connecticut General Statutes § 47a-16 provides:

(a) A tenant shall not unreasonably withhold consent to the landlord to enter into the dwelling unit in order to inspect the premises, make necessary or agreed to repairs, altera-

tions or improvements, supply necessary or agreed to services or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen or contractors.

deed, rather than demonstrate a change of position by the defendant, showing the premises to a prospective tenant is consistent with the defendant's service of the notice to quit. Giving a new key to the plaintiff was simply done so that the plaintiff could enter the premises during the time remaining before it was evicted.

## B.

### Anti-forfeiture

■ The plaintiff argues that even if the lease was terminated by the notice to quit, that result should be reversed under an anti-forfeiture doctrine adopted by Connecticut courts. *See In re Masterworks, supra,* 94 B.R. at 267. Reliance on that equitable doctrine, however, is not available if a tenant has inexcusably failed to pay rent agreed upon by the parties. *Mobilia, Inc. v. Johonor M. Santos,* 4 Conn. App. 128, 492 A.2d 544 (1985). The gravamen of the plaintiff's position is that it has the right to assign its lease; that it had a bona fide buyer-assignee willing to pay cash which would have paid the defendant in full; that the defendant unreasonably withheld its consent in violation of the lease; and that its failure to pay rent to the defendant was therefore justified.

■ The plaintiff relies on *Warner v. Konover,* 210 Conn. 150, 553 A.2d 1138 (1989), in which the Connecticut Supreme Court held that a landlord who retains discretion to withhold consent to an assignment must exercise that discretion in good faith and fair dealing, despite the absence of a provision that consent should not be unreasonably withheld. In that case, the landlord refused to consent to assignment unless the rent was renegotiated. In dicta, the court suggested that good faith precludes the exercise of discretion for the purpose of recapturing an opportunity foregone when the contract was executed.

(b) A landlord may enter the dwelling unit without consent of the tenant in case of emergency.

(c) A landlord shall not abuse the right of entry or use such right of entry to harass the tenant. The landlord shall give the tenant reasonable written or oral notice of his intent

The plaintiff implies that the defendant refused to consent to the Hogan assignment because it wished to lease the premises to Chart House, with which it had briefly negotiated before the premises were leased to Combine of Fairfield. No such implication is warranted. The evidence adduced at trial supports the finding that the defendant had reserved the right to refuse an assignment which did not reasonably comport with its concept of an appropriate tenant mix. The only inquiry that ripened into a bona fide offer to purchase was the proposed Hogan's Casa Miguel assignment. The plaintiff argues that the defendant's rejection of Hogan on November 14th for the stated reason that it was a Mexican style restaurant was improper, but even if it was, that conclusion is irrelevant in view of the plaintiff's prior deliberate decision to use its cash flow to pay suppliers and employees rather than rent. An unexcused failure to pay rent from and after June, 1988, is hardly a proper foundation upon which to seek equitable relief as a remedy for an alleged improper rejection of a lease assignment in November.

■ In apparent recognition of that inconsistency, the plaintiff relies on promissory estoppel to excuse its failure to pay rent, but that doctrine is not available to one whose own omission or inadvertance has contributed to the alleged harm. *Novella v. Hartford Accident & Indem. Co.,* 163 Conn. 552, 566, 316 A.2d 394 (1972). Moreover, promissory estoppel requires proof of two essential elements: first, a party must do or say something intended to induce another to believe in the existence of certain facts and, second, the other must actually change position or take some act to its detriment which it would not otherwise have done. *First Conn. Small Business Inv. Co. v. Arba, Inc.,* 170 Conn. 168, 175, 365 A.2d 100 (1976); *Multiplastics, Inc. v. Arch Indus., Inc.,* 166 Conn. 280,

to enter and may enter only at reasonable times, except in case of emergency.

(d) A landlord has no other right of entry except (1) as permitted by section 47a–16a, (2) pursuant to a court order, or (3) if the tenant has abandoned or surrendered the premises. Conn.Gen.Stat.Ann. § 47a–16 (West Supp.1988).

286, 348 A.2d 618 (1974); *Novella, supra,* 163 Conn. at 563, 316 A.2d 394.

The claim is made that by conferring with a prospective tenant while at the same time representing to the plaintiff that it did not want to delay an assignment of the lease or cause the plaintiff hardship, the defendant was guilty of a misrepresentation which the plaintiff relied upon to its detriment, and that as a consequence, the defendant should be estopped from claiming that the lease was terminated. But, in order for the estoppel theory to be viable, the plaintiff would first have to prove that the defendant represented to the plaintiff that a notice to quit would not be served if the plaintiff attempted to find a suitable assignee. The evidence does not support any such finding.

Even if the defendant's rejection of Hogan was an unreasonable exercise of its reservation of rights, there was no such promise. To the contrary, Seley testified that when he spoke to the defendant's agent about the plaintiff's financial difficulties and the plan to look for an acceptable purchaser-assignee, the question of delayed rent payments or concessions "never came up". Moreover, the plaintiff's failure to pay any rent after June had nothing to do with an attempt to find an assignee. Rent was not paid because of a decision by the plaintiff's management to use its inadequate cash flow to pay employees and trade creditors rather than rent. *Plaintiff's Pretrial Brief at 6.* Promissory estoppel is not applicable here.

### III.

For the foregoing reasons, judgment may enter that the lease to The Oyster Club of Greenwich was terminated prior to the commencement of this bankruptcy case and therefore may not be assumed, and IT IS SO ORDERED.